JOSEPH L. WYLER v. THE STATE.

Indictment for murder. The testimony against the defendant was circumstantial, and the facts were such as seemed not to exclude the possibility of the deceased having taken her own life. The court charged the jury " that it might be necessary to decide by what means the deceased came to her death ; whether she had a motive to commit suicide ; and if so, whether it had been shown beyond a reasonable doubt that she did not kill herself, or die from accidental causes. You will also consider whether it was possible or probable that she committed suicide, or died accidentally, by the means of which you believed she died." *Held*, that this charge, presented in its proper relations and connections, was not objectionable as having a tendency to throw upon the defendant the burthen of proving that the deceased did not commit suicide, and that if he had failed to establish it, to warrant the inference that he himself did the act.

APPEAL from Walker. Tried below before the Hon. Peter W. Gray.

This was an indictment against Joseph L. Wyler for the murder of his wife, Elizabeth Wyler.

On Monday morning the defendant went to the houses of some of his neighbors, professing to be in search of his wife, who had left his house the night before, stating the circumstances under which she left, as follows :   That she had gone to bed, a difficulty arose between them concerning their infant child, and she sprang out of the bed, ran out of the house, he following her outside of the yard, she turned the corner of the fence, disappeared in the dark, and he saw her no more.   That he followed her to induce her to return, and said that she looked very strangely when she left.

The proof showed that they lived on very bad terms together ; or, rather, that the defendant was in the habit of using her very ill.   The proof by his own declarations, made during her life, showed that he had, a short time previous to her death, beaten her severely.   The deceased several times had left his house, and went to the houses of her neighbors, complaining of having been whipped by her husband.   One of the witnesses testified as to having seen marks of violence upon her person three times upon such occasions.   Another witness stated that about two or three weeks previous to her death, he saw her in her yard ; she then stated that the defendant had locked her out, had given her nothing to eat, and had whipped her that morning.   About a week before her death, she expressed fears that her husband would kill her, and told two of her female friends " that she knew he was going to kill her, and that she had come to tell them."   One of them testified that she said, " if ever she was missing, they might know that the defendant had killed her.   That the richer Wyler got, the worse he treated her."   That witness stated that on such occasions, when she left her home, the defendant did not come after her, except in the last instance.

William Birdwell, one of the defendant's neighbors, to whose house he had come on Monday morning in search of his wife, stated that he saw specks of blood on his pantaloons legs.   He advised defendant to go to town, (Huntsville) and there make inquiry concerning his wife, and that if he failed to learn anything there, to return, and the neighbors would help hunt for her.   On Tuesday evening the witness went to defendant's house, who told

him that he had, that morning, gone to town, and could hear nothing of her. Witness asked him " what could have become of her ?" to which he replied, " she must have gone up to the Bedias." The witness told him that could not be so, for she would not have passed his house without stopping there; he then told the defendant " he thought his wife was in those woods somewhere, and that he and his neighbors would come up there next morning and hunt for her; that he would find her if he had to have a man for every tree." Witness stated that when he said this, he saw the defendant's countenance fall, and he shed tears. The defendant then said, " they need not come to his house, that he would meet them next morning at witness' house." The neighbors, accordingly, came to the latter place, but the defendant did not meet them. The result of the search was the finding of the body, on Wednesday morning, floating in a stagnant pool of water about three hundred yards from the defendant's house ; a stick six or eight feet in length was standing in the water, cut at one end and broken at the other, (as if recently done,) one end of which was about two feet below the body, and the other leaning against the bank. On the brink of the bank was the appearance of something having slided down ; the grass and weeds were broken down over a small pine log near the bank, looking as if something had been dragged over it. Near the waters' edge were shoe tracks plainly made in the soft mud, which corresponded exactly with the shoes worn by the defendant. The deceased was dressed in her night clothes and a calico sack when she was found; one of her shoes floating, or rather resting, on her back. There was a road fifteen or twenty steps from the pool of water. After the discovery of the body the defendant was found at his house. On being informed of the fact, he started down to the spot, walking slowly; he was met and advised not to go there until the coroner's inquest was held. He stopped, seated himself, and commenced smoking.

One of the parties said to him the circumstances were strongly against him to show that he had killed his wife, or treated her so badly as to induce her to kill herself. He denied that he had mistreated her. On going to the house, blood was discovered spat-

tered on the floor and wall of the house, and on the draw-bars in front of the house. The defendant said that "he had intended, before this, to leave his wife; that they had not spoken twenty words together in two weeks; and that they did not sleep together." While the deceased was being buried, the defendant spoke of "the mean manner in which she had treated him." It was in proof that, on one occasion, when the deceased had "run off from him," (as the witnesses expressed it,) she went to a certain mill, whither he also went, and, while there, remarked that she wanted him to pay her some money, and let her go; and asked her how much she wanted, who replied, "fifty dollars." Defendant wished to pay it to her in the presence of witnesses, that she could not come back on him again.

Two physicians examined the body at the inquest, and testified, in substance, that they could not determine with certainty that violence had been used upon her, owing to the pendent position of the head, which may have produced the settling of blood around her temples, presenting the appearance of bruises, which, otherwise, might have indicated, from its appearance, that violence had been there inflicted. That she had the appearance of having died from strangulation; her eyes were protruded, and they thought there was no breach of the skin, but could not give a positive opinion for the reason assigned, and the fact that mortification had taken place. The clothes of the deceased were so twisted around the neck, that it was necessary to cut them loose. The pool of water was two feet in depth, eight or ten feet wide, and about twenty feet in length.

The defendant proved that about eighteen months before the death of the deceased, whilst they lived in the town of Huntsville, (whence they had removed about ten months before her death,) her conduct was that of a deranged person, and on one occasion referred to that she was screaming at her residence at night, wishing to leave her home, the defendant holding her by the arm and trying to pacify her. A physician was called in, who considered her laboring under mental derangement, and prescribed medicine for her; she recovered in a few days. Whilst in that condition on the night referred to she caught up her child,

Wyler v. The State.

went out of the house screaming "murder, fire," and such expressions. In reply to an enquiry she said that her husband had not mistreated her. On the following day she walked about the streets, with the child in her arms, talking and acting as if crazy.

To explain the circumstance as to the blood on the pantaloons and elsewhere, the defendant proved that his dog had a torn and bleeding ear. A witness testified that after the defendant was committed to jail, he noticed the ear of the dog, which was torn, and seemed to have been in that condition for several days. After turning away from the dog he found his own pantaloons spotted with blood, caused by the shaking of the head by the dog. The ear was then bleeding. On Tuesday evening preceding the finding the body, another witness testified that he saw the dog, with a block attached to his neck, cross the fence near the draw bars of the yard fence, the block remaining on the opposite side. The witness thought the dog could have reached the draw bars by slipping the chain along the top rail of the fence a little; he was restless in trying to follow his master.

The court charged the jury fully and at length as to the effect of direct and circumstantial evidence, and the rules by which they were to be governed in considering the issues submitted to them, and proceeded as follows:

"Was Mrs. Wyler killed, or did she die from natural causes? If she was killed, was it by strangulation or drowning, or by means of violence unknown? If she was killed by either of these means, then was she killed by accident, or did she commit suicide, or is it the legitimate conclusion beyond reasonable doubt that the accused killed her? In coming to a conclusion," &c., as recited in the beginning of the opinion.

The defendant asked the court to charge the jury, " That if there is any possibility of reasonably accounting, from the evidence, for the death of Mrs. Wyler by suicide or accident, or by any natural cause, and if from the evidence the death of the deceased can be explained by any other hypothesis, then it is the duty of the jury to acquit.

" The circumstances proved must be strong and conclusive

enough to exclude the hypothesis, that the deceased could have come to her death by any other means than at the hands of the accused.

"The jury must be satisfied, beyond a reasonable doubt, that the deceased came to her death at the hands of the accused."

Which charges the court refused, because the first is too strongly stated, and the others are sufficiently given in the general charge.

The defendant was convicted, and sentenced to ten years confinement in the penitentiary. The motion for a new trial by the defendant, which was overruled, assigned as grounds therefor that the verdict of the jury was contrary to the law and evidence; contrary to the charge of the court; and because the charge of the court was contrary to law.

The defendant appealed, and assigned as error the overruling of the motion, and the refusal to give the charges asked for on the trial.

*Branch & Abercrombie* for the appellant.

*Attorney-General,* for the appellee.

ROBERTS, J.—The part of the charge of the court complained of is as follows : " In coming to a conclusion on these questions, it may be necessary to decide first by what means she came to her death, then consider whether she had a motive to commit suicide, and if so whether it has been shown, beyond a reasonable doubt, that she did not kill herself, or die from accidental causes. You will also consider whether it was possible or probable that she committed suicide, or died accidentally by the means of which you believe she died."

It is contended that the tendency of this charge was to throw upon the defendant the burthen of proof, that the deceased did not commit suicide, and, that as defendant had not proved this, that he did the act himself.

We do not think the charge liable to any such objection. The object of the charge was to instruct the jury, in substance, that

after considering the means by which she came to her death, her motive to commit suicide, if they believed she had any, and the possibility or probability of her having committed suicide by, or having accidentally died from, such means, they must be satisfied beyond a reasonable doubt that she did not commit suicide or die accidentally.

Any possible obscurity or confusion of ideas that may have arisen upon this charge, was immediately removed by an instruction so clear and direct that its meaning could not be mistaken, which was that "if then, considering all the facts proved to your satisfaction, you are not satisfied beyond a reasonable doubt that the accused killed the deceased by some of the means specified, or by means of violence unknown, then you will find the defendant not guilty."

This idea was presented in its proper connection throughout the whole charge, and the court might well decline to charge it again in another shape, as asked by the defendant's counsel.

There is nothing in the charge calculated to mislead the jury, nor does it fail, upon the whole, to present to the jury a clear and just view of the issue before them, and the rules of law arising thereon.

There is no cause to believe that the court erred in overruling the motion for a new trial. The facts show with reasonable certainty that she did not commit suicide, or come to her death by accidental causes, and that therefore some person killed her.

The previous conduct of defendant, and the state of feeling existing between them at the time, render it probable that he might have been the guilty agent. His tracks near the pool of water in which she was found, point to him most significantly. The other facts rather increase than rebut the violent presumption thus raised. Possibly he may not be guilty. But human reason and human effort have been exhausted to discover the truth. After a full and fair investigation, the minds of the jurors were satisfied of his guilt beyond a reasonable doubt. We cannot say, from the evidence, that their verdict was not right.

Judgment affirmed.